**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| ARTIS C. CARROLL, JR. | : **CIVIL ACTION** |
|---|---|
| | : |
| v. | : **NO. 16-1406** |
| | : |
| MILLERSVILLE UNIVERSITY OF PA, | : |
| *et al.* | : |

## MEMORANDUM

**KEARNEY, J.**                                                                                    **February 14, 2020**

A student admitted to a university's clinical program on a probationary basis who is then dismissed from the program due to his continuing shortfall in grades may understandably be upset. He may view the dismissal as unfair. He may try to shift blame to the university and its agents. But he may not violate the law in manifesting his disappointment. If he does, the university and its officials may find he violated its code of conduct. But the university officials must offer an acceptable level of due process, including notice and an opportunity to be heard, before an extended suspension. We today return to Artis C. Carroll, Jr.'s *pro se* multiple challenges to Millersville University's suspension of him from a clinical program several years ago. We earlier dismissed the University as immune. After parsing through dozens of pages of *pro se* allegations, we today dismiss most of his claims with prejudice. But he may proceed on a due process claim against two university agents as he pleads, and there is no contrary argument, a lack of notice of the charges for his March 26, 2015 conduct *before* his alleged hearing on April 15, 2015 or providing accurate notice of the April 15, 2015 hearing. Mr. Carroll may proceed on this due process claim against Director Austin and Vice President Richardson. We require discovery and possible trial whether these two agents deprived Mr. Carroll of due process.

## I.  Background

### A.  Alleged *pro se* facts

Millersville University accepted Artis C. Carroll as a student in July 2011.[1]  In Fall 2012, Mr. Carroll changed his major from Biology to Allied Health Technologies - Respiratory Therapy, a program within the University's Biology Department.[2]

#### *The University's Respiratory Therapy Program*

The University's Allied Health Respiratory Therapy Program (Program) involves two-years of course work at the University and nineteen months of clinical training at UPMC Pinnacle - Lancaster Regional Medical Center.[3]  The University designed clinical training to "provide the student with all of the skills needed to practice as a graduate respiratory therapist."[4] The Director of the Program's clinical component is Elaine Chrissos and its Assistant Director is Jarrod Harleman.[5]

The Program has a Student Handbook advising students on Program requirements and expectations.[6]  The Handbook also guides dismissal policy: "A student may be dismissed from the Program for: [1] Earning less than a 1.0 average in any program course; [2] Failing to meet the terms of a probation; [3] Demonstrating a level of clinical proficiency which is consistently lower than the acceptable standard of hazardous to patient while on probation; [or,] [4] Health, achievement or conduct warranting such action."[7]

#### *The University admits Mr. Carroll to the Program's clinical training on probationary status.*

Around February 2014, the University's Respiratory Therapy Selections Committee interviewed Mr. Carroll for placement in the Program's clinical component.[8]  Mr. Carroll then had a 2.35 grade point average in science and mathematics courses and 2.51 overall grade point

2

average.[9]   The Selections Committee told Mr. Carroll his "science/mathematics [grade point average] [was] below the . . . 2.50 for [Allied Health Technologies] . . . required to enter the clinical program."[10]   But based on positive interviews and letters of recommendation, the Committee "offer[ed Mr. Carroll] a position in the clinical program, beginning May19 [sic], on a probationary status."[11]   The Selections Committee explained if Mr. Carroll's science/math grade point average became a "2.50 . . . or better" after the Summer 2014 semester, the Department would remove him from probationary status.[12]

Mr. Carroll began the clinical aspect of the Program in Summer 2014.[13]   After the Summer 2014 semester, Mr. Carroll had a 2.35 grade point average in science and mathematics courses and a 2.50 overall grade point average.[14]   Mr. Carroll does not allege the Department removed him from probation after the Summer 2014 semester.

### Director Chrissos dismisses Mr. Carroll from the University's Respiratory Therapy Program.

In the Fall 2014 semester, Mr. Carroll enrolled in six clinical courses.[15]   Early in the semester, Mr. Carroll, who is an African American, called University Professor Dr. John Hoover and Dean of the Math and Science Department Dr. Robert Smith complaining Director Chrissos and Assistant Director Harleman racially discriminated against him.[16]   Mr. Carroll claimed Director Chrissos and Assistant Director Harleman called him racially charged names, made racist jokes, and gave him the middle finger.[17]   Mr. Carroll alleges Dean Smith told him Director Chrissos and Assistant Director Harleman are not University employees and to wait before filing a formal complaint.[18]   Mr. Carroll filed a formal complaint in mid-October to the University's Executive Director of Human Resources about the alleged discrimination.[19]

In mid-October 2014, Mr. Carroll filed a different formal complaint alleging Director Chrissos failed to follow the Respiratory Therapy Program grading scale and denied him access

to his student records.[20] Later in the semester, Director Chrissos and Assistant Director Harleman told Mr. Carroll "he will be subjected to [d]ismissal before final grades are posted with the [University] Registrar."[21] Mr. Carroll appealed the dismissal to a panel, claiming Director Chrissos again failed to follow the Program's grading scale and also arguing Director Chrissos prematurely dismissed him from the Program by not placing him on probation.[22] The panel upheld Mr. Carroll's dismissal from the Program.[23]

The University released Fall 2014 Semester grades in late December. Mr. Carroll received a D-minus in Respiratory Assessment and Therapeutic Care and Clinical Practice 1.[24] Mr. Carroll believes he should have received a C in at least one of these courses but Director Chrissos failed to follow the Handbook grading scale.[25] Mr. Carroll claims Director Chrissos did not follow the Handbook grading scale and lowered Mr. Carroll's grade from a C to a D because she wanted to dismiss Mr. Carroll from the Program.[26] He alleges Director Chrissos then changed Mr. Carroll's D to a D-minus to "cover up" dismissing Mr. Carroll from the Program without placing Mr. Carroll on probation.[27] Mr. Carroll claims he "notice[d]" the change when the University's Registrar posted grades.[28]

Mr. Carroll contested the D-minus grades by emailing Dean Smith.[29] Dean Smith replied by attaching the grade appeal procedure.[30] The grade appeal procedure involved a three-step process.[31] Mr. Carroll claims he met the first step by going to the Clinic to speak to Director Chrissos and Assistant Director Harleman and to ask to see his student records.[32] But he claims Director Chrissos refused to speak to him and a security guard escorted him out of the facility.[33] Mr. Carroll followed the second step by visiting Professor Hoover, Chairman of the biology department, to discuss the grades.[34] Professor Hoover found all grades were correct.[35] Mr.

Carroll then followed the third step by filing a written appeal with Dean Smith.[36] Dean Smith denied the appeal and assured Mr. Carroll the "Fall 2014 final grades are fair and correct."[37]

### *The University finds Mr. Carroll violated the University's Student Code of Conduct.*

Mr. Carroll returned for the Spring 2015 semester and still expected to graduate with a degree in Liberal Arts in December 2015.[38] In February of the Spring semester, the University's Judicial Affairs Assistant Director Ron Wiafe charged Mr. Carroll with violating the University's student code of conduct.[39] Assistant Director Wiafe based the charges on Mr. Carroll's conduct during numerous student records requests.[40] Assistant Director Wiafe held a hearing on these charges; Mr. Carroll says Assistant Director Wiafe failed to "produce any evidence to support the charges."[41] At the hearing, Assistant Director Wiafe found Mr. Carroll violated the student code of conduct and required him to attend counseling.[42]

Mr. Carroll served Dean Smith with a Family Educational Rights and Privacy Act (FERPA) Request form to access his records.[43] On March 25, 2015, the University held a FERPA meeting where Dean Smith and Professor Hoover gave Mr. Carroll about half of the requested documents.[44] Professor Hoover told Mr. Carroll if he continued requesting documents, the University would charge him with violating the student code of conduct.[45] Dean Smith told Mr. Carroll they discovered a grade mistake—a D-minus in Respiratory Assessment and Therapeutic Care should have been a D—and told Mr. Carroll they sent a grade change form to the Registrar's office.[46] Mr. Carroll asked for a copy of this grade change form, but Dean Smith replied he would have to pick it up from the Registrar's office.[47]

When Mr. Carroll went to the Registrar's office, Registrar employee Wendy "Doe" told Mr. Carroll the office did not have the grade change form; she then called her colleague Amnita Breaux and asked Mr. Carroll to leave or she would call the University's Police Department.[48]

Mr. Carroll did not leave until two officers arrived—Sergeant Jason Flood and Officer Christian Yanak.[49]  Mr. Carroll claims Sergeant Flood told him to contact Vice President of Student Affairs Thomas Richardson before returning to the Registrar's office.[50]

The following day, March 26, 2015, Vice President Richardson advised Mr. Carroll the grade change form could be picked up at the Registrar's office.[51]  When Mr. Carroll went to the Registrar's office to collect the form, Registrar employee John Sicotte met Mr. Carroll in the hallway and told him to leave the building.[52]  Mr. Carroll alleges he began to leave the Registrar's office when Sergeant Flood confronted and arrested him.[53]  Sergeant Flood brought Mr. Carroll back to the University's police station and handcuffed him while Sergeant Flood's colleague, Officer Phoulideth Chanthongthip, went to the Registrar to investigate the incident.[54]  After returning to the station, Officer Chanthongthip cited Mr. Carroll for defiant trespass, actual communication to the actor.[55]  Mr. Carroll claims Deputy Chief Howard Bauman then changed the charge to a summary offense—simple trespass with intent to terrorize.[56]

On March 27, 2015, Judicial Affairs Director Lori Austin emailed Mr. Carroll requesting a meeting.[57]  At the meeting, Director Austin handed Mr. Carroll three letters.[58]  The first two letters alerted Mr. Carroll to charges against him for the incidents occurring at the Registrar on March 25 and March 26.[59]  The third letter—signed by Vice President Richardson—notified Mr. Carroll he would be placed on immediate interim suspension "solely because of what happen[ed] at the [University's] Registrar's Office" and advised he should remain off University property or they would charge him with trespassing.[60]  Mr. Carroll claims the letters did not allege facts supporting the discipline.[61]

Mr. Carroll denied any wrongdoing and protested by remaining on the University's campus.[62]  Four days after receiving the suspension and no trespass order, University Officer

Richard Stuchkus arrested Mr. Carroll outside of one of his classrooms.[63]  Officer Stuchkus charged him with a defiant trespass, actual communication to actor.[64]  In April 2015, Director Austin suspended Mr. Carroll until Spring 2016.[65]

Mr. Carroll contested both the March 26 and March 31 misdemeanor trespass charges during a jury trial in the Court of Common Pleas for Lancaster County.[66]  The jury acquitted Mr. Carroll of the March 26 charge but found him guilty of the March 31 charge for defiant trespass.[67]  Mr. Carroll received a one-year prison sentence.[68]

### B.    Procedural history

In March 2016, Mr. Carroll filed this case against Lancaster County, Pennsylvania and Millersville University.[69]  In his original complaint, Mr. Carroll pleaded he submitted an unanswered complaint to Millersville University alleging racial discrimination, his instructors denied him access to his student records, the University suspended him without a hearing, and University officers arrested him unlawfully.[70]  Mr. Carroll alleged violations of the First, Fifth, Sixth, and Fourteenth Amendments, the Family Educational Rights and Privacy Act, fraud, false imprisonment, defamation, and discrimination.[71]

Within days of this filing, the Honorable Lawrence Stengel dismissed Mr. Carroll's claims against Lancaster County under 28 U.S.C. § 1915(e) and ordered service on the University.[72]  The University waived service in February 2017.[73]

On March 27, 2017, Mr. Carroll filed an amended complaint suing the University and twelve additional Defendants: Director Chrissos, Assistant Director Harleman, Professor Hoover, Dean Smith, Assistant Director Wiafe, Vice President Richardson, Director Austin, Registrar Breaux, Former University President Dr. John Anderson, Jonathan Klapper-Lehman, University Vice President Brian Hazlett, and UPMC - Lancaster Regional Medical Center.[74]  But it appears

Mr. Carroll never served the twelve new. The docket shows no service of this complaint on new Defendants, waivers, or USM-285 submissions.

In April 2017, the University moved to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[75] Judge Stengel allowed Mr. Carroll the opportunity to file a second amended complaint and denied the University's motion as moot.[76] Judge Stengel explained "[t]he newly amended complaint, however, shall be the second and last amended complaint."[77] Chief Judge Juan Sanchez reassigned the case from Judge Stengel to Judge Joseph Leeson.[78] The University moved to dismiss because Mr. Carroll failed to file his second amended complaint by the ordered deadline.[79] Judge Leeson denied the University's motion without prejudice and set a new filing deadline for Mr. Carroll.[80] Chief Judge Sanchez reassigned the case to us.[81] We gave Mr. Carroll another extension to file his second amended complaint.[82] Again, the University moved to dismiss because Mr. Carroll failed to file his second amended complaint by our deadline.[83] We denied the University's motion to dismiss and gave Mr. Carroll another "last chance" to file an amended complaint.[84] We placed the case on suspense while Mr. Carroll appealed a separate issue relating to counsel representation.[85] Our Court of Appeals dismissed his appeal.[86]

We then gave Mr. Carroll a fourth "last chance" to file a second amended complaint.[87] Mr. Carroll filed his second amended complaint in May 2019 suing the same thirteen Defendants from the first amended complaint and adding twelve new Defendants: Registrar employees Sicotte, Hutchinson, and Wendy "Doe," Deputy Chief Bauman, Officers Stuchkus, Yanak, and Chanthongthip, Sergeant Flood, Craig Stedman, Andrew Gonzalez, Tricia Boyd, and Rebecca Mowery.[88] In total, Mr. Carroll's second amended complaint sues twenty-three individuals, sued in their individual and official capacities, UPMC - Lancaster Regional Medical Center, and the University.

The second amended complaint asserts seven causes of action, including:[89]

- "Count I Deprivation of Liberty and Property without Due Process of Law pursuant [to] 42 U.S.C. § 1983 Civil Action for Deprivation of Rights against Millersville University, Lori Austin, Ron Wiafe, and Thomas Richardson;"[90]

- "Count [II] Deprivation of Liberty and Property without Due Process of Law pursuant [to] Title 42 U.S.C. § 1983 Civil Action for Deprivation of Rights against Lori Austin;"[91]

- "Count [III] Deprivation of Liberty and Property without Due Process of Law pursuant [to] Title 42 U.S.C. § 1983 Civil Action for Deprivation of Rights against Elaine Chrissos;"[92]

- "Count [IV] Breach of Contract against Elaine Chrissos, Jarrod Harleman, and John Hoover;"[93]

- "Count [V] False Arrest and False Imprisonment against Christian Yanak, Richard Stuchkus, and Jason Flood;"[94]

- "Count [VI] Breach of Contract against Elaine Chrissos, Jarrod Harleman, Millersville University, UPMC, and John Hoover and Robert Smith;"[95]

- "Count [VII] Violation of Civil Rights Act of 1964 Title II 201(a), 203(c), Title III and Title IV against Millersville University, Alison Huncthington [sic], Wendy Doe, John Sicotte, Lori Austin, Ron Wiafe, and Thomas Richardson."[96]

A week after Mr. Carroll filed his second amended complaint, the University moved to dismiss the claims asserted against it—Counts I, VI, and VII.[97] We granted the University's motion and dismissed the University.[98] We explained sovereign immunity barred Mr. Carroll's claims against the University; and, even if sovereign immunity did not bar these claims, Mr. Carroll failed to a state a claim against the University for breach of contract or under the Civil Rights Act of 1964.[99] We reasoned Mr. Carroll failed to state a claim for breach of contract because he alleged the University breached the Student Handbook and this Handbook could not be plausibly be considered a contract.[100] We explained Mr. Carroll failed to state a claim under

9

the Civil Rights Act of 1964 because he failed to show (for his Title II claim) the University is a place of a public accommodation or to show Titles III and IV allow a private right of action.[101]

As for the non-University Defendants, shortly after Mr. Carroll filed the second amended complaint, we ordered the Clerk of Court to issue summonses and directed Mr. Carroll to "complete USM-285 forms so the [United States] Marshals can serve these Defendants."[102] In August 2019, the Marshals returned the summonses unexecuted because they never received the USM-285 forms from Mr. Carroll.[103] A few days after the Marshals returned the summonses unexecuted, we ordered Mr. Carroll to show cause in a memorandum as to "why we should not dismiss this case against these remaining parties for failure to prosecute."[104] Mr. Carroll filed a timely response to our show cause order where he explained he believed he "timely responded" to our order directing him to complete USM-285 forms when he filed a "Motion for Service" on this docket in May 2019 identifying the names and addresses of all Defendants.[105] Mr. Carroll also stated he sent USM-285 forms to the Marshals in late August.[106] The Marshals confirmed they had received the USM-285 forms. We ordered the Clerk of Court to re-issue summonses and directed the Marshal to serve the summonses and second amended complaint to all unserved Defendants.

## II.    Analysis

Fourteen Defendants now move to dismiss the claims against them.[107] Two moving Defendants—Former University President Anderson and Student Affairs Vice President Hazlett—move to dismiss because Mr. Carroll does not plead facts or claims against them. We also evaluate whether to dismiss claims against three other Defendants, Deputy Chief Bauman, Officer Chanthongthip, and Registrar Breaux, because Mr. Carroll does not plead claims against them. The other eight moving Defendants—Professor Hoover, Vice President Richardson,

Director Austin, Sergeant Flood, Officer Stuchkus, Registrar Sicotte, Retired Dean Smith, Assistant Director Wiafe, and Registrar Hutchinson—move to dismiss claims asserted against them.

### A. Mr. Carroll fails to state a claim against Former University President Anderson, Student Affairs Vice President Hazlett, Deputy Chief Bauman, Officer Chanthongthip, and Registrar Breaux.

Mr. Carroll names Former University President Anderson, Student Affairs Vice President Hazlett, Deputy Chief Bauman, Officer Chanthongthip, and Registrar Breaux as Defendants in his second amended complaint. But Mr. Carroll does not allege any facts about President Anderson or Vice President Hazlett, nor does Mr. Carroll name them in his "Statement of Claims." Mr. Carroll also fails to state claims against Deputy Chief Bauman, Officer Chanthongthip, and Registrar Breaux. President Anderson and Vice President Hazlett move to dismiss arguing they cannot be named as Defendants without Mr. Carroll stating facts or legal claims against them. We agree, and include Deputy Chief Bauman, Officer Chanthongthip, and Registrar Breaux in our analysis.

A complaint failing to state a defendant's specific acts of violating the plaintiff's rights fails to meet the requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure.[108] Mr. Carroll does not plead any specific facts about President Anderson or Vice President Hazlett. He fails to meet Rule 8(a)(2). Mr. Carroll fails to show what President Anderson or Vice President Hazlett did or did not do to affect his legal rights. He fails to state a claim against either of these Defendants in the second amended complaint. He also fails to state a claim against Deputy Chief Bauman, Officer Chanthongthip, and Registrar Breaux.

At this point in this already three-year old litigation, we will not allow Mr. Carroll to amend his complaint for a fourth time to plead a cause of action against Former University

President Anderson, Vice President Hazlett, Deputy Chief Bauman, Officer Chanthongthip, or Registrar Breaux. The alleged events giving rise to this lawsuit occurred in Fall 2014 to Spring 2015. This is Mr. Carroll's second amended complaint. We have allowed Mr. Carroll numerous chances to amend—even giving him a "fourth last chance" to file the second amended complaint before us. There is no basis to allow Mr. Carroll another attempt to state a claim against Former University President Anderson, Vice President Hazlett, Deputy Chief Bauman, Officer Chanthongthip, or Registrar Breaux for events occurring between four and five years ago. We dismiss Former University President Anderson, Vice President Hazlett, Deputy Chief Bauman, Officer Chanthongthip, and Registrar Breaux with prejudice.

**B.    Some of Mr. Carroll's claims against Defendants fail for reasons addressed in our June 6, 2019 Memorandum.**

Our June 6, 2019 Order and Memorandum dismissed the University. We concluded sovereign immunity barred Mr. Carroll's claims against the University; and, even if sovereign immunity did not bar these claims, Mr. Carroll failed to a state claim against the University for breach of contract or under the Civil Rights Act of 1964.[109] The moving Defendants today—who are all employees of the University—argue the law affords them sovereign immunity for claims Mr. Carroll brings against them in their official capacity. Moving Defendants who are sued for breach of contract or under the Civil Rights Act of 1964 also move to dismiss these claims for the same reasons explained in our June 6, 2019 Memorandum.

**1.    University employees are entitled to sovereign immunity for Mr. Carroll's claims against them in their official capacity.**

Mr. Carroll sues the eight remaining moving Defendants—Professor Hoover, Vice President Richardson, Director Austin, Sergeant Jason Flood, Officer Stuchkus, Registrar Sicotte, Retired Dean Smith, and Assistant Director Wiafe—in their individual and official

capacities. Each Defendant argues sovereign immunity shields them from suit in their official capacities as University employees.

Holding sovereign immunity barred claims against the University, we explained the "Eleventh Amendment bars suits against a state by its own citizens" unless (1) Congress "authorize[s] such a suit" or (2) the State "waive[s] its sovereign immunity by consenting to suit."[110] We found Congress had not authorized suits nor had the Commonwealth waived immunity for claims of due process, breach of contract, or for violation of the Civil Rights Act of 1964.

We now consider whether the law also bars University employees from being sued in their official capacities. "Individual state employees sued in their official capacity are also entitled to Eleventh Amendment immunity because 'official-capacity suits generally represent only another way of pleading an action' against the state."[111] Individual state employees enjoy sovereign immunity if their actions are taken "within the scope of [their] duties."[112]

The eight remaining individual Defendants all claim sovereign immunity because Mr. Carroll identifies them in the complaint as University employees. Sergeant Jason Flood and Officer Stuchkus are employees of the University's Police Department.[113] Professor Hoover teaches in the University's Biology Department.[114] Dr. Robert Smith is the retired University Dean of the Math and Science Department.[115] Vice President Richardson, Assistant Director Ron Wiafe, and Director Austin work in the University's Judicial Affairs Department.[116] John Sicotte works for the University's Registrar.[117] Each moving Defendant is a state employee; Mr. Carroll's claims relate to these employees actions within the scope of their duties. Sovereign immunity applies to these officials to actions asserted against them in their official capacity

unless Congress authorized suit or the Commonwealth of Pennsylvania waived immunity for Mr. Carroll's claims.

We already ruled there is no waiver of sovereign immunity for due process, breach of contract, or for a violation for the Civil Rights Act of 1964. For the same reason, individual Defendants have sovereign immunity for these claims brought against them in their official capacity.

We did not have the occasion to consider whether sovereign immunity bars claims for false arrest or false imprisonment. We must consider this question now. The Pennsylvania General Assembly has waived sovereign immunity in nine instances: "(1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines."[118] Because false arrest and false imprisonment are intentional torts not listed under any of these exceptions, the named moving Defendants enjoy sovereign immunity if their actions were taken "within the scope of [their] duties."[119]

Mr. Carroll sues Richard Stuchkus and Jason Flood for false arrest and false imprisonment. These moving Defendants are members of the Millersville University Police Department. Sergeant Flood arrested Mr. Carroll and brought him back to the police station when Mr. Carroll refused to leave the Registrar's Office after Registrar Breaux warned him to leave or face Millersville University police officers. Officer Stuchkus arrested Mr. Carroll when he appeared on campus after receiving a no trespass order on March 31, 2015. They took these actions within the scope of their duties. Sovereign immunity bars false arrest and false imprisonment claims against Sergeant Flood and Officer Stuchkus in their official capacity.

### 2. Mr. Carroll fails to state a claim for breach of contract against Professor Hoover or Dean Smith.

Even if sovereign immunity did not bar the breach of contract claim, we would dismiss Mr. Carroll's breach of contract claim. Mr. Carroll sues Professor Hoover and Dean Smith for breach of contract alleging the Respiratory Therapy Program's Student Handbook is a contract.[120] He claims Professor Hoover "ignored the fact that [Director] Chrissos violated the" Handbook when she fraudulently changed his grade and dismissed him from the program without a probation period.[121] Six months ago, the University moved to dismiss Mr. Carroll's breach of contract claim against it arguing the Handbook is not a contract. We agreed with the University.[122] Professor Hoover and Dean Smith argue we should apply this reasoning to dismiss the breach of contract claim against them because Mr. Carroll also bases his breach of contract action against Professor Hoover and Dean Smith on the Handbook. We agree and dismiss Mr. Carroll's breach of contract claim against Professor Hoover and Dean Smith.[123] As Mr. Carroll only sues Professor Hoover and Dean Smith under theories of breach of contract, both individual Defendants are dismissed with prejudice.

### 3. Mr. Carroll fails to state a claim under Title II of the Civil Rights Act of 1964 against Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson.

Mr. Carroll alleges Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson punished him for asking for access to his student records.[124] Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson move to dismiss Mr. Carroll's Title II claim for the same reason we dismissed the claim against the University—because Mr. Carroll fails to plead a place of "public accommodation."

In our June 6, 2019 Memorandum, we explained Mr. Carroll's Title II claim requires the conduct occur in a place of public accommodation.[125] Our Court of Appeals directs a place of public accommodation must "be one of the statutorily enumerated categories of establishments that serve the public," and "its operations must affect commerce."[126] Congress did not enumerate public universities as a category of establishments under Title II.[127]

"[T]he overriding purpose of Title II [is] 'to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public.'"[128] Mr. Carroll did not allege facts showing the space in the University where he suffered harm is a place of public accommodation. We dismiss the claim under Title II against Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson.[129]

### 4. We dismiss Mr. Carroll's claim under Title III as it does not allow him a private cause of action.

Mr. Carroll alleges Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson violated his rights under Title III of the Civil Rights Act of 1964.[130] We dismissed Mr. Carroll's Title III claim against the University reasoning Title III did not afford Mr. Carroll a private right of action. Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson argue we should dismiss Mr. Carroll's Title III against them.

In dismissing Mr. Carroll's Title III claim against the University, we explained: "Under existing case law, Title III, only authorizes actions by the Attorney General, and not private plaintiffs."[131] Because no citizen can bring a private claim under Title III of the Civil Rights Act of 1964, we dismissed Mr. Carroll's claim against the University under Title III. For the same

reason, we dismiss Mr. Carroll's Title III claims against Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson.

### 5. We dismiss Mr. Carroll's claim under Title IV because Mr. Carroll does not allege facts, but even if he did, Title IV is not a separate cause of action.

Mr. Carroll alleges Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson violated his rights under Title IV of the Civil Rights Act of 1964.[132] Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson argue this claim should be dismissed for the same reason we dismissed Mr. Carroll's Title IV claim against the University.

In dismissing the Title IV claim against the University, we explained Congress enacted Title IV "to remedy the problem of segregation in public schools and colleges."[133] We remain persuaded by the district court's reasoning in *Davis v. Hooper*.[134] In *Davis*, a father sued the school district on his son's behalf for the school district's poor attempts to handle a classmate's inappropriate touching of his son at school.[135] The district court dismissed the Title IV claim because it "does not create a separate cause of action, but rather preserves private rights of actions under other civil rights acts."[136]

Mr. Carroll fails to allege facts related to segregation. But even if Mr. Carroll could allege segregation, Title IV does not provide a separate cause of action.[137] We dismiss Mr. Carroll's Title IV claim against Director Austin, Registrar Sicotte, Assistant Director Wiafe, Vice President Richardson, and Registrar Hutchinson.

Because Mr. Carroll alleges no further claims against Registrars Sicotte and Hutchinson, we dismiss them with prejudice.

## C.    Pennsylvania's Statute of Limitations bars some of Mr. Carroll's claims.

The Defendants argue Pennsylvania's statute of limitations bars Mr. Carroll's claims.[138] In Pennsylvania, parties grieving certain state law claims, such as false arrest and false imprisonment, must commence their actions within two years.[139] Our Court of Appeals directs us to apply the two-year statute of limitations to most federal law claims, such as those under Section 1983, unless Congress expressly incorporated a limited discovery rule or a judge-made doctrine tolling the statute of limitations, such as equitable estoppel, into the federal statute.[140]

"The general rule is that state tolling principles also govern § 1983 claims."[141] Pennsylvania allows for tolling of the statute of limitations in instances such as infancy.[142] Absent tolling, a civil rights plaintiff has two years from when he "knew or should have known of the injury upon which its actions is based."[143]

But plaintiffs may avoid dismissal on a technicality and instead achieve resolution on the merits if their amended complaint relates back to a timely pleading under Federal Rule of Civil Procedure 15(c).[144] "At the same time, Rule 15(c) endeavors to preserve the important policies served by the statute of limitations — most notably, protection against the prejudice of having to defend against a stale claim, as well as society's general interest in security and stability — by requiring 'that the already commenced action sufficiently embraces the amended claims.'"[145]

Mr. Carroll alleges events in October 2014 to April 2015 gave rise to his claims. Mr. Carroll knew about his injuries as they occurred. The statute of limitations accrued at the time of the events giving rise to his claims. Mr. Carroll does not argue the statute of limitations tolled, and we do not see how state or federal tolling principles may apply. The Pennsylvania statute of limitations bars Mr. Carroll's claims not commenced within two years of when they occurred, unless later amended complaints "relate back" to the original complaint under Rule 15(c).

Mr. Carroll initiated this case on March 25, 2016, naming Lancaster County and Millersville University as Defendants.[146] Judge Stengel promptly dismissed Lancaster County. On March 27, 2017, Mr. Carroll filed an amended complaint suing the University and twelve additional Defendants: Director Chrissos, Assistant Director Harleman, Professor Hoover, Dean Smith, Assistant Director Wiafe, Vice President Richardson, Director Austin, Registrar Breaux, Former University President Dr. John Anderson, Jonathan Klapper-Lehman, University Vice President Brian Hazlett, and UPMC - Lancaster Regional Medical Center.[147] After several missed deadlines and an unsuccessful appeal, we gave Mr. Carroll a fourth "last chance" to file a second amended complaint.[148] Mr. Carroll filed his second amended complaint on May 6, 2019 suing the same thirteen Defendants from the first amended complaint and adding twelve new Defendants: Registrar employees Sicotte, Hutchinson, and Wendy "Doe," Deputy Chief Bauman, Officers Stuchkus, Yanak, and Chanthongthip, Sergeant Flood, Craig Stedman, Andrew Gonzalez, Tricia Boyd, and Rebecca Mowery.[149]

Moving Defendants argue the statute of limitations bars Mr. Carroll's remaining claims of false arrest and false imprisonment and violation of due process under Section 1983. Defendants argue Mr. Carroll's first amended complaint, filed on March 27, 2017, asserted claims outside of the two-year statute of limitations, except the claims arising from the March 31, 2015 arrest and 2015 convictions. But they conclude Mr. Carroll never served the first amended complaint on moving Defendants—he only served Millersville University—so the statute of limitations bars claims against moving Defendants unless they relate back to the original complaint.

We proceed by first evaluating the relation back of the second amended complaint to the original complaint. We conclude the second amended complaint does not relate back to the

original complaint and the statute of limitations bars the false arrest and false imprisonment claims. Second, we evaluate whether the second amended complaint relates back to the timely claims in the first amended complaint to determine whether the statute of limitations bars these claims. Though Defendants argue the only timely claims in the first amended complaint are those based on the March 31, 2015 arrest and subsequent convictions,[150] Mr. Carroll also included timely due process claims stemming from the March 27, 2015 interim suspension and April 2015 temporary suspension in the first amended complaint. We conclude the statute of limitations does not bar these due process claims, as they relate back to the timely claims in the first amended complaint.

### 1. Mr. Carroll's second amended complaint does not relate back to the original complaint and the statute of limitations bars Mr. Carroll's false arrest and false imprisonment claim against Sergeant Flood and Officer Stuchkus in their individual capacities.

Mr. Carroll's false arrest and false imprisonment claims against Sergeant Flood and Officer Stuchkus in their individual capacity must relate back to the original complaint to survive the two-year statute of limitations. Mr. Carroll did not name Sergeant Flood or Officer Stuchkus in his original complaint. We analyze relation back under Federal Rule of Civil Procedure 15(c) to determine whether the false arrest and false imprisonment claims relate back. We conclude they do not.

"[Rule 15(c)] is the only vehicle available for a plaintiff to amend the complaint to change or add a defendant after the statute of limitations has run."[151]  Rule 15(c) allows a plaintiff to amend his complaint to change the party or name new parties despite the running of an applicable state statute of limitations when he satisfies three conditions: (1) the newly asserted claim arose out of the conduct, transaction, or occurrence set out in the original pleading and, within the period provided by Federal Rule of Civil Procedure 4(m), or ninety days, the newly

named Defendants are (2) sufficiently on notice of the facts and claims giving rise to the proposed amendment so they will not be prejudiced in defending on the merits, and (3) the newly named Defendants knew or should have known the action would have been brought against them, but for a mistake concerning the proper party's identity.[152]

### a. The claims asserted by Mr. Carroll in his second amended complaint arise out of the conduct, transaction, or occurrence plead in the original pleading.

Mr. Carroll asserted claims arising out of the conduct, transaction, or occurrence plead in the original pleading, satisfying the first requirement for relating back under Rule 15(c).

In his original complaint, Mr. Carroll plead he submitted an unanswered complaint to Millersville University alleging racial discrimination, his instructors denied him access to his student records, the University suspended him without a hearing, and University officers arrested him unlawfully.[153] Mr. Carroll alleged violations of the First, Fifth, Sixth, and Fourteenth Amendments, Family Educational Rights and Privacy Act, fraud, false imprisonment, defamation, and discrimination.[154] The second amended complaint expands on originally plead events and legal theories.

"[A]mendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading fall within Rule 15(c)." Amendments may also relate back when the amended complaint changes the legal theory.[155]

Mr. Carroll's amended complaints address the same "conduct, transaction, or occurrence" as the original complaint. He alleges harms arising from the same events occurring at Millersville University, but he added moving Defendants in the amended complaints. While Mr. Carroll satisfies the first prong of Rule 15(c), he has not shown Officer Stuchkus or Sergeant

Flood had fair notice or should have known the action would be brought against them within the ninety days under Federal Rule of Civil Procedure 4(m).

### b. Mr. Carroll did not sufficiently plead Defendants had notice of the facts and claims giving rise to the proposed amendment.

The "touchstone for relation back is fair notice."[156] Rule 15(c) requires actual or imputed notice to newly added Defendants within ninety days, or mid-June 2016. Defendants did not receive formal notice within the ninety-day period.[157] To impute notice under Rule 15(c), we may consider two methods: The "shared attorney" method, when the originally named party and the parties sought to be added are represented by the same attorney so the shared attorney may have communicated the possibility of joinder in the action to the parties sought to be added; and the "identity of interest" method, when parties are "so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other."[158]

Sergeant Flood and Officer Stuchkus argue we cannot impute notice from the originally named Defendant, Millersville University, to them under the "shared attorney" method because moving Defendants' attorney, who represented Millersville University after the original complaint, represented only one of the moving Defendants—University President Anderson— before October 2019. The shared attorney method does not impute notice to newly named Defendants where the parties did not share an attorney during the ninety-day period after the original complaint's filing.[159] Earlier in this analysis, we dismissed the claims against President Anderson with prejudice because Mr. Carroll did not plead facts or claims against him. We will not impute notice under the shared attorney method to the rest of the moving Defendants, as they did not share an attorney with Millersville University during the ninety-day period.

Sergeant Flood and Officer Stuchkus argue we cannot impute notice under the "identity of interest" method because the moving Defendants and Millersville University do not share a sufficient nexus of interests. They argue Mr. Carroll cannot plead they have authority to award him injunctive relief or reverse his discipline or academic decisions and some of them are not even supervisory employees. They also argue moving Defendants could not have received notice of the original complaint within ninety days of filing because Millersville University itself did not learn of the lawsuit until almost a year after filing.

"[A]bsent other circumstances that permit the inference that notice was actually received, a non-management employee . . . does not share a sufficient nexus of interests with his or her employer so that notice given to the employer can be imputed to the employee for Rule 15(c)(3) purposes."[160] The identity of interest method imputes notice to managerial employees, or employees who share a sufficient nexus of interests with their employer so their interests as employees are identical to the employer's interests.[161] But our Court of Appeals instructs us to generally not impute notice to employees with no administrative or supervisory duties.[162]

We do not analyze the managerial and administrative duties of each moving Defendant because we could not logically impute notice from an original Defendant which itself lacked awareness of the lawsuit until after the ninety-day period. Millersville University waived service in February 2017.[163] Because the original Defendant did not have actual notice of Mr. Carroll's lawsuit until eleven months after he filed the original complaint, we could not conclude the moving Defendants had constructive notice within ninety days of the original complaint. Moving Defendants are prejudiced in maintaining a defense on the merits.

c. **The moving Defendants did not know or should have known the action would have been brought against them, but for a mistake.**

Even if Mr. Carroll satisfied the notice requirement, he has not shown Officer Stuchkus or Sergeant Flood knew or should have known the lawsuit would have been brought against them but for a mistake in identity.

Rule 15(c) requires newly added Defendants know or should have known, within ninety days of the original complaint, they would have been named but for an error.[164] "The rationale behind this requirement is that a legitimate legal claim should not be squelched by a party mistakenly identifying the party to be sued."[165] To evaluate the third requirement, we must consider two factors: (1) whether the plaintiff made a mistake as to the identity of the Defendants, and (2) the newly added Defendants had knowledge or constructive knowledge the action would have been brought against them but for the mistake.[166]

The first factor, a mistake of identity, includes mistakes resulting from misnomer as well as lack of knowledge.[167] Pleading errors could include misidentifying a party or naming a legally erroneous individual or institutional defendant because of confusion as to the proper party. "The Rule is widely-understood to allow the addition of new parties that were never originally named or described."[168] Confusion as to naming institutional or individual Defendants is precisely the type of mistake recognized by courts.[169] Mr. Carroll, a *pro se* litigant, named Millersville University without knowing sovereign immunity would insulate the defendant. We conclude Mr. Carroll made a mistake of identity within the meaning of Rule 15(c) when he named Millersville University instead of moving Defendants.

The second factor asks "what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint against the first defendant.

To the extent the plaintiff's post filing conduct informs the prospective defendant's understanding of whether the plaintiff initially made a 'mistake concerning the proper party's identity,' a court may consider the conduct."[170] Mr. Carroll fails to satisfy the third requirement of Rule 15(c) for the same reason he failed the second: The Defendants could not have known about the lawsuit but for a mistake because the original Defendant, Millersville University, had no knowledge of the lawsuit until eleven months after Mr. Carroll filed the original complaint. We will not hold the new Defendants knew or should have known they would have been sued when the original Defendant did not have actual knowledge.

### 2. Mr. Carroll's due process claims in the second amended complaint relate back to the timely due process claims in the first amended complaint.

The timely claims in the first amended complaint are those claims based on events occurring on or after March 27, 2015. Those claims include due process claims brought under Section 1983 regarding Mr. Carroll's March 27, 2015 interim suspension and April 2015 to Spring 2016 temporary suspension.[171] Interpreting Mr. Carroll's complaints liberally, the corresponding claims in the second amended complaint include allegations of due process violations against Lori Austin, Ron Wiafe, Thomas Richardson, and Elaine Chrissos. We evaluate whether the claims against moving Defendants Director Austin, Assistant Director Wiafe, and Vice President Richardson relate back to the first amended complaint.

Mr. Carroll named Director Austin, Assistant Director Wiafe, and Vice President Richardson as Defendants in his first amended complaint.[172] When the plaintiff does not seek to add or change parties, Federal Rule of Civil Procedure Rule 15(c)(1)(B) dictates whether the new pleading relates back to the previous pleading. Under Rule 15(c)(1)(B), the new pleading relates

back if the claim or defense asserted in the amended pleading "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." [173]

"[A]mendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading fall within Rule 15(c)." [174] We must consider whether the two pleadings share a common core of operative facts. [175] If the pleadings share a common core of operative facts, we may conclude the opposing party had fair notice of the general facts and legal theory of the new pleading. [176]

Mr. Carroll asserted due process claims arising out of the conduct, transaction, or occurrence set out in the first amended complaint. In his first amended complaint, Mr. Carroll plead Director Austin, Assistant Director Wiafe, and Vice President Richardson prevented him from receiving copies of his student record, and they suspended him without a hearing after requesting copies of his student record on March 27, 2015. [177] In his second amended complaint, Mr. Carroll pleads Assistant Director Wiafe charged Mr. Carroll with violating the student code of conduct and held a hearing which did not provide him due process. [178] Mr. Carroll also pleads he met with Director Austin on March 27, 2015 when she provided him a letter from Vice President Richardson suspending Mr. Carroll because of his actions at the Registrar Office while seeking his student record on March 25 and 26, 2015. [179] He also pleads Director Austin suspended him without a judicial affairs hearing. [180]

Because Mr. Carroll pleaded due process claims arising out of the conduct, transaction, or occurrence set out in the first amended complaint, the statute of limitations does not bar these due process claims against Director Austin, Assistant Director Wiafe, and Vice President Richardson.

**D.      Mr. Carroll pleads Section 1983 due process claims.**

Mr. Carroll pleads Section 1983 due process claims against Director Austin and Vice President Richardson but his due process claim against Assistant Director Wiafe fails. Defendants argue qualified immunity and the *Heck v. Humphrey* doctrine shield them from liability for potential due process violations. We disagree. We deny Director Austin and Vice President Richardson's motion to dismiss Mr. Carroll's Section 1983 due process claims against them.

> **1.      Mr. Carroll adequately pleads a due process claim against Director Austin and Vice President Richardson but fails to plead a due process claim against Assistant Director Wiafe.**

Mr. Carroll alleges moving Defendants deprived him of his property interest in his education in violation of his Fourteenth Amendment right to due process.[181]   To state a procedural due process claim under 42 U.S.C. § 1983, Mr. Carroll must allege: (1) a deprivation of "an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,'" and (2) "the procedures available to him [or her] did not provide 'due process of law.'"[182]

State law indicates whether Mr. Carroll has a property interest protected by the due process clause of the Fourteenth Amendment.[183] "Courts in the Third Circuit have repeatedly recognized that a graduate student has a property interest protected by procedural due process in the continuation of his or her course of study under Pennsylvania law."[184]

In *Goss v. Lopez*, the Supreme Court held public school students have a property interest in their education and the due process clause protects them from deprivation of this property interest without certain minimum procedures.[185] The Court specifically established the requirements of due process for a suspension of ten days or less of a public school student.[186]

"Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of ten days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."[187] Notice and hearing should precede the student's removal from the school, unless the student "poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school."[188] If the student poses a danger to others, the required notice and hearing should occur as soon as practicable after removal.[189] The Supreme Court recognized longer suspensions and expulsions may require more formal procedures.[190]

The formal procedures required depend on three factors from *Mathews v. Eldridge*: (1) the private interests at stake; (2) the governmental interests at stake, including the government function involved and the fiscal and administrative burdens entailed by additional or substitute requirements; and (3) the fairness and reliability of the existing procedures and the probable value, if any, of any additional or substitute procedural safeguards.[191]

### a. Mr. Carroll's due process claim against Assistant Director Wiafe fails.

Mr. Carroll pleads Assistant Director Wiafe violated his due process rights when Assistant Director Wiafe charged him with violating the student code of conduct without providing details of the alleged misconduct or the specific rule Mr. Carroll violated.[192] Mr. Carroll also pleads Assistant Director Wiafe failed to explain the charges at his February 26, 2015 hearing and did not allow Mr. Carroll to present witnesses.[193] Assistant Director Wiafe found Mr. Carroll responsible for the charges and required him to see the school counselor.[194]

28

Mr. Carroll argues Assistant Director Wiafe caused Mr. Carroll to lose his property interest in his education in violation of his due process rights.[195]

Assistant Director Wiafe argues Mr. Carroll did not have a due process right implicated when Assistant Director Wiafe charged him with violations of the student code and held a hearing. Because the hearing only resulted in the requirement Mr. Carroll seek counseling, Assistant Director Wiafe argues he did not deprive Mr. Carroll of a property interest in his education. We agree.

Even if Assistant Director Wiafe deprived Mr. Carroll of a property interest, he did not violate Mr. Carroll's due process rights. Assistant Director Wiafe provided him written notice[196] and held a hearing on the charges, which Mr. Carroll attended while refusing to participate without recording the interaction.[197] Mr. Carroll fails to allege facts about these events to adequately plead a violation of due process. We dismiss with prejudice all claims against Assistant Director Wiafe and next consider whether Mr. Carroll successfully pleads facts alleging a due process violation from his suspensions.

### b. Mr. Carroll adequately pleads a due process claim against Director Austin and Vice President Richardson.

Mr. Carroll pleads Director Austin and Vice President Richardson suspended him without a hearing, causing Mr. Carroll to lose his property interest in his education in violation of his due process rights.[198] At a meeting on March 27, 2015, Director Austin handed Mr. Carroll three letters. The first letter explained charges resulting from Mr. Carroll's March 25, 2015 conduct; the second letter explained charges resulting from Mr. Carroll's March 26, 2015 conduct; and the third letter, signed by Vice President Richardson, notified Mr. Carroll of his placement on interim suspension "solely because of what happen[ed] at the [University's] Registrar's Office on March 25th and March 26th" and advised he should remain off University property or the

29

University would charge him with trespassing.[199]  Mr. Carroll pleads, in April 2015, Director Austin suspended him until Spring 2016 without adequate notice or a pre-removal hearing on the charges from March 25, 26, 27, and 31, 2015.[200]  Mr. Carroll alleges due process violations as to both suspensions: the interim suspension beginning on March 27, 2015 and the temporary suspension implemented on April 17, 2015 until the Spring 2016 semester.[201]

Director Austin and Vice President Richardson concede Mr. Carroll has a procedural due process right in his continued education at a public university. But they argue suspension for student discipline does not require pre-removal hearings when the student's actions pose a danger to persons or property.[202]  Because a jury convicted Mr. Carroll of simple trespass with intent to terrorize from March 26, 2015 and defiant trespass from his behavior on March 31, 2015,[203] moving Defendants argue they did not violate Mr. Carroll's due process rights by not providing him a pre-removal hearing when he posed a danger to the community.  Director Austin and Vice President Richardson also argue the criminal proceedings resulting from Mr. Carroll's suspension-inducing behavior provided him with due process. Finally, moving Defendants argue Mr. Carroll's public filings show he received due process from Millersville University outside of the criminal process.

Before evaluating Director Austin and Vice President Richardson's arguments, we must remind counsel the temporary suspension deprived Mr. Carroll of his property interest in his education for far longer than the less-than-ten-day suspensions discussed in *Goss*. Millersville University suspended Mr. Carroll from April 17, 2015 to December 31, 2015—an eight-month suspension.[204]  The *Matthews v. Eldridge* balancing test requires more formal due process procedures than those required in *Goss*. The first *Eldridge* factor, the private interests at stake, weighs in favor of a more formal level of due process.[205]  Mr. Carroll has a significant interest in

his education and an eight-month deprivation of this property interest is substantial. The second *Eldridge* factor is neutral.[206] While the governmental interests at stake are important, the fiscal and administrative burdens entailed by additional requirements, such as a more formal hearing could present witnesses, are not large. The third *Eldridge* factor, the fairness and reliability of the existing procedures and the probable value of any additional procedural safeguards, weighs in favor of a formal level of due process.[207] The existing procedures did not provide Mr. Carroll a pre-removal hearing and perhaps failed to provide him adequate notice of the post-removal hearing. Regarding these pleadings as true, the existing procedures did not reliably or fairly provide Mr. Carroll due process. Additional safeguards may have allowed Mr. Carroll an opportunity to be heard. Because we find Mr. Carroll plead moving Defendants did not satisfy the minimum level of due process as defined in *Goss*, we do not reach the question of what level of due process the Constitution would require.

Director Austin and Vice President Richardson first argue they did not need to provide Mr. Carroll a pre-removal hearing because he posed a danger on campus. Though the Supreme Court in *Goss* explained public institutions may hold post-removal hearings if the student facing suspension poses a danger to persons or property, moving Defendants have not shown Mr. Carroll posed a danger precluding them from providing him a pre-removal hearing. The jury acquitted Mr. Carroll of simple trespass with intent to terrorize from events occurring on March 26, 2015.[208] Mr. Carroll's criminal conviction for defiant trespass from his self-described "protest" of his interim suspension on March 31, 2015 does not demonstrate he posed a danger to persons or property.[209] Director Austin and Vice President Richardson cannot argue Mr. Carroll's behavior on March 31, 2015, leading to a criminal conviction, formed the basis for their decision to not hold a pre-removal hearing as to the interim suspension doled out on March 27,

2015. As to the temporary suspension removing Mr. Carroll until Spring 2016, moving Defendants do not explain how Mr. Carroll's behavior on March 31, 2015 posed a danger. Mr. Carroll alleges he intended to go to class, in what appears to be a peaceful protest, when Officer Stuchkus arrested him.[210] Defying a no-trespass order, without accompanying threatening behavior, does not make Mr. Carroll dangerous enough to lose his property interest in a pre-removal hearing.

We could envision Mr. Carroll's behavior in spring 2015 giving rise to the charges of violating the student code of conduct informed Director Austin and Vice President Richardson's decision to not hold pre-removal hearings on the interim suspension or the temporary suspension. On March 26, 2015, Director Austin defined the March 25 charges pending against Mr. Carroll as harassing and disorderly conduct, failure to comply with law enforcement or university officers, and creating excessive noise or commotion.[211] Director Austin's letters from April 17, 2015 describe additional charges of trespassing, unlawful conduct, failing to comply with a sanction, and failing to appear at hearings when directed to do so.[212] While these letters describe how Mr. Carroll may have created disturbances in his attempt to locate his student records, Director Austin and Vice President Richardson fail to explain how Mr. Carroll's actions rise to the level of "danger" precluding the availability of a hearing before suspension. At this stage, relying solely on the pleadings, we will not assume Mr. Carroll posed a danger to persons or property to the extent of waiving his due process right to a pre-removal hearing.

Defendants also argue the criminal proceedings resulting from Mr. Carroll's behavior on March 26 and 31, 2015 provided him due process. Director Austin and Vice President Richardson do not cite supporting case law. *Goss* contradicts this conclusion. Mr. Carroll's property interest in his education is separate and distinct from his criminal trespass charges,

warranting a separate and distinct process. As we determined Director Austin and Vice President Richardson have not shown how Mr. Carroll posed danger to persons or property necessitating post-removal hearings, we reject the argument post-removal criminal proceedings alleviate Millersville University's need to comport with the due process clause of the Fourteenth Amendment.

Defendants' final argument Mr. Carroll received due process from Millersville University also fails. Mr. Carroll pleads he did not receive a pre-removal hearing before his interim suspension, because Director Austin and Vice President Richardson told Mr. Carroll about his interim suspension, allegedly based on his behavior on March 25 and 26, on March 27.[213] Because moving Defendants failed to explain how Mr. Carroll posed a danger to persons or property, we will not dismiss Mr. Carroll's due process claim based on his interim suspension at this time. In addition, the interim suspension lasted more than ten days and thus may implicate a higher level of due process than required in *Goss*. But we do not reach the *Eldridge* three-factor balancing test because Director Austin and Vice President Richardson do not demonstrate they provided the baseline level of due process required by *Goss*.

The pleadings do not paint a clear picture of the events leading to Mr. Carroll's temporary suspension. Mr. Carroll alleges Director Austin suspended him without a hearing based on events occurring on March 25, 26, 27, and 31, 2015.[214] Mr. Carroll attaches a March 26, 2015 letter from Director Austin providing notice of charges stemming from the March 25 incident, setting a scheduled hearing for April 3, 2015.[215] Mr. Carroll pleads Director Austin, in "early April," served him a document charging violations of the student code of conduct on March 27 and 31, 2015, but does not plead he received pre-hearing notice of alleged student code violations from March 26.[216]

Though Mr. Carroll attaches three letters from Director Austin, all dated April 17, 2015, concerning incidents occurring on March 26, 27, and 31, these letters claim Mr. Carroll failed to appear at his scheduled hearing on April 15, 2015.[217] We cannot locate an allegation or document showing Mr. Carroll received notice of the charges against him for his March 26 conduct *before* his alleged hearing on April 15, 2015. These letters appear to combine notice and post-hearing sentencing in one.

We also cannot locate anything providing Mr. Carroll notice of the April 15, 2015 hearing. Though the March 26 letter from Director Austin provides Mr. Carroll notice of a hearing scheduled for April 3, 2015 regarding the March 25 incident, Director Austin's April 17 letter regarding the March 26 incident explains "all four outstanding cases are being heard at the same time."[218] Because the combination of "all four incidents" may refer to the incidents on March 25, 26, 27, and 31, we can fairly question whether the April 3, 2015 hearing occurred. Regardless of the occurrence or nonoccurrence of the April 3 hearing, Mr. Carroll pleads Director Austin and Vice President Richardson violated his due process rights because he alleges he did not receive due process and the pleadings do not show notice of a pre-removal hearing. And the *Eldridge* three-factor balancing test requires an even more formal level of due process. While Director Austin and Vice President Richardson may ultimately succeed in their argument, discovery must first clarify the events leading to Mr. Carroll's temporary suspension.

**2.      Qualified immunity does not bar Mr. Carroll's due process claims.**

Director Austin and Vice President Richardson argue qualified immunity shields them from liability against Mr. Carroll's due process claims, as a reasonable person would not believe the moving Defendants violated clearly established rights. Moving Defendants do not properly recite the standard for qualified immunity.

34

A government official "is entitled to qualified immunity as long as she does not violate a 'clearly established' constitutional or federal right."[219] "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[220] "If a government official . . . reasonably thinks her conduct complies with the law, she is shielded from liability."[221] "A right is clearly established for qualified immunity purposes where its contours are 'sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right.'"[222] "In other words, the application of the right to the issue at hand must be 'beyond debate.'"[223]

To determine whether qualified immunity shields Director Austin and Vice President Richardson from Mr. Carroll's due process claims, we ask "(1) whether the facts alleged by the plaintiff show the violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct."[224] If Mr. Carroll fails to satisfy either prong, we must find in favor of Director Austin and Vice President Richardson as a matter of law.[225]

As we have discussed above at length, Mr. Carroll adequately pleads violation of his due process rights. Mr. Carroll's due process rights were clearly established at the time of the alleged misconduct because Mr. Carroll alleges he was a student at Millersville University and moving Defendants placed him on interim suspension without a pre-removal hearing and placed him on temporary suspension potentially without notice or the opportunity to be heard. The Supreme Court in *Goss v. Lopez* clearly establishes these minimum due process requirements for suspending a student. Relying on the plead facts, a reasonable official would have known his actions violated a clearly established right. We cannot, at this stage, accept Director Austin and Vice President Richardson's argument qualified immunity shields them from suit in their individual capacity.

### 3. The *Heck v. Humphrey* favorable termination doctrine does not bar Mr. Carroll's due process claims.

Director Austin and Vice President Richardson argue *Heck v. Humphrey* bars Mr. Carroll's due process claims against them, as success in those claims would necessarily invalidate Mr. Carroll's convictions. Defendants argue the conviction of defiant trespass "means that the communication not to trespass—*i.e.* the verbal suspension and/or Richardson letter of March 27, 2015, was valid."[226] Director Austin and Vice President Richardson overstate the reach of the *Heck v. Humphrey* favorable termination doctrine.

In *Heck v. Humphrey*, the Supreme Court held a plaintiff convicted of a crime may not pursue a Section 1983 civil rights claim where success of the plaintiff's case would necessarily imply the invalidity of his conviction or sentence unless the plaintiff showed favorable termination of the underlying proceeding.[227] "[A] [Section] 1983 plaintiff must prove [his] . . . conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of writ of habeas corpus" to recover damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid."[228] Where a plaintiff seeks damages relating "to a conviction or sentence that has *not* been so invalidated," the plaintiff's civil rights claim "is not cognizable under [Section] 1983."[229] But "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit."[230]

The Court analogized the Section 1983 claim to the common-law cause of action of malicious prosecution, which requires proof of favorable termination of the prior criminal proceeding.[231] Adopting this element of malicious prosecution, the Court applied its new

favorable termination doctrine to the example of the crime of resisting arrest.[232] The Court defined the crime, "intentionally preventing a peace officer from effecting a *lawful* arrest," holding a Section 1983 action against the arresting officer for violation of his Fourth Amendment right to be free from unreasonable seizures would be incognizable because success would negate an element of his convicted offense.[233]

In *Nelson v. Jashurek*, our Court of Appeals reversed a district court's holding *Heck* barred a prisoner's Section 1983 excessive force claim.[234] The prisoner brought a Section 1983 excessive force claim, which the district court held would necessarily invalidate the prisoner's underlying conviction of resisting arrest.[235] Our Court of Appeals held *Heck* does not bar an excessive force claim because the claim can stand without challenging any element of the conviction.[236] Finding the arresting officer used excessive force would not imply the arrest itself was unlawful.[237] But *Heck* would bar a claim for false arrest, as success on a false arrest claim would invalidate an element of the underlying conviction of resisting arrest.[238]

A jury convicted Mr. Carroll of defiant trespass.[239] Pennsylvania's defiant trespass statute reads: "A person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given... actual communication to the actor."[240]

If Mr. Carroll succeeded on his Section 1983 due process claims, his success would not invalidate his conviction for defiant trespass on March 31, 2015. A jury found Mr. Carroll guilty for defiant trespass because he violated the March 27, 2015 no trespass order. The no trespass order was distinct from the interim suspension: Mr. Carroll pleads Vice President Richardson's letter described why they imposed an interim suspension and ordered Mr. Carroll "must leave campus immediately after receiving this notice and remained [sic] off of MU property or he'll be

arrested and charged with Trespassing."[241] Mr. Carroll received notice against trespass by actual communication to the actor through Vice President Richardson's letter, separate and apart from his interim suspension. He went to campus in violation of the no trespass order he had received. The terms of the interim suspension did not prohibit Mr. Carroll's presence on campus; rather, the no trespass order forbid him from returning.

If Mr. Carroll succeeded on the merits of his Section 1983 due process claim, his successful civil suit would not necessarily imply the invalidity of his defiant trespass conviction. The favorable termination doctrine does not bar his claim. We deny Director Austin and Vice President Richardson's motion to dismiss the due process claims at this junction.

## III.    Conclusion

We deny Director Austin's and Vice President Richardson's motion to dismiss the due process claims. We grant the motion to dismiss all other claims. We dismiss Former University President Anderson, Student Affairs Vice President Hazlett, Professor Hoover, Deputy Chief Bauman, Sergeant Flood, Officers Stuchkus and Chanthongthip, Registrars Sicotte and Breaux, Retired Dean Smith, Assistant Director Wiafe, and Registrar Hutchinson with prejudice.

---

[1] ECF Doc. No. 83 at ¶ 4.

[2] *Id.* at ¶ 5.

[3] *Id.* at ¶ 6; ECF Doc. No. 17-1 at 5.

[4] ECF Doc. No. 17-1 at 5.

[5] ECF Doc. No. 83 at ¶ 6.

[6] ECF Doc. No. 17-1 at 3-16.

[7] *Id.* at 13.

[8] *Id.*

38

[9] *Id.*.

[10] *Id.*

[11] *Id.* at 2.

[12] *Id.*

[13] ECF Doc. No. 83 at ¶ 7.

[14] *Id.* at ¶ 8.

[15] ECF Doc. No. 17-1 at 40.

[16] ECF Doc. No. 83 at ¶¶ 6, 9, 16.

[17] *Id.* at ¶ 9.

[18] *Id.* at ¶ 9.

[19] ECF Doc. No. 17-1 at 17.

[20] ECF Doc. No. 83 at ¶ 9.

[21] *Id.* at ¶ 10.

[22] *Id.* at ¶¶ 10-12.

[23] *Id.* at ¶ 11.

[24] *Id.* at ¶ 12; ECF Doc. No. 17-1 at 39.

[25] ECF Doc. No. 83 at ¶ 12.

[26] *Id.*

[27] *Id.*

[28] *Id.* at ¶ 13.

[29] *Id.*

[30] *Id.*

[31] *Id.* at ¶¶ 14-16.

[32] *Id.* at ¶ 14.

[33] *Id.*

[34] *Id.* at ¶ 15.

[35] *Id.*

[36] *Id.*

[37] *Id.* at ¶ 16.

[38] *Id.* at ¶ 17.

[39] *Id.*; ECF Doc. No. 17-3 at 13-14.

[40] ECF Doc. No. 83 at ¶¶ 16-17.

[41] *Id.* at ¶ 17.

[42] *Id.*

[43] *Id.* at ¶ 16.

[44] *Id.* at ¶ 18.

[45] *Id.*

[46] *Id.*; ECF Doc. No. 17-1 at 39-40.

[47] ECF Doc. No. 83 at ¶ 18.

[48] *Id.* at ¶ 20.

[49] *Id.*

[50] *Id.*

[51] *Id.* at ¶¶ 21, 28.

[52] *Id.* at ¶ 21.

[53] *Id.* at ¶ 22.

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.* at ¶ 23.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.* at ¶ 24.

[63] *Id.* at ¶ 25.

[64] *Id.*

[65] *Id.* at ¶ 35.

[66] *Commonwealth of Pennsylvania v. Carroll*, 88 MDA 2016, CP-36-CR-0001537-2015 (Pa. Super. 2016). Our Court of Appeals has "held that a prior judicial opinion constitutes a public record of which a court may take judicial notice." *M & M Stone Co. v. Pennsylvania*, 388 F. App'x 156, 162 (3d Cir. 2010). When taking judicial notice of a prior judicial opinion, we may not examine the trial transcripts or assess the validity of the facts in the opinion. *Id.* But we may consider the legal conclusions reached by the court in the earlier opinion. *Id.* ("Without considering the underlying factual analyses by the EHB and Commonwealth Court for their truth, and instead simply acknowledging the EHB and Commonwealth Court's conclusions, the District Court properly [took judicial notice].").

[67] *Carroll*, 88 MDA 2016.

[68] *Id.*

[69] ECF Doc. No. 3.

[70] *Id.* at 3.

[71] *Id.* at 2.

[72] ECF Doc. No. 2.

[73] ECF Doc. No. 11.

[74] ECF Doc. No. 17.

[75] ECF Doc. No. 18.

[76] ECF Doc. No. 46 at n.1.

[77] *Id.* ("I am granting this motion for leave to amend because of the *pro se* status of the plaintiff. It is important to allow such a plaintiff to have a full and complete opportunity to be heard.").

[78] ECF Doc. No. 51.

[79] ECF Doc. No. 52.

[80] ECF Doc. No. 59.

[81] ECF Doc. No. 65.

[82] ECF Doc. No. 66 ("Plaintiff is granted one last chance to file an amended complaint").

[83] ECF Doc. No. 69.

[84] ECF Doc. No. 74 (emphasis removed) ("[W]e amend our October 9, 2018 Order (ECF Doc. No. 66) solely to allow Plaintiff one last chance to file a [second] amended complaint").

[85] ECF Doc. No. 78.

[86] ECF Doc. No. 81.

[87] ECF Doc. No. 82.

[88] ECF Doc. No. 83.

[89] Mr. Carroll pleads three discrete sections with the (1) federal constitutional rights, (2) federal laws, and (3) state laws at issue. *Id.* at ¶ 2(b)-(d). But "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Mr. Carroll's citation to the United States Constitution, federal law, and state law, alone, does not meet Rule 8. We only consider Mr. Carroll's claims meeting Rule 8, which he asserts in the "Statement of Claims" section of the second amended complaint.

The Supreme Court directs a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). We are nonetheless directed to review the pleading to ensure it has "sufficient factual matter; accepted as true; to state a claim to relief that is plausible on this face." *Fantone v. Latini*, 780 F.3d 184, 193 (3d Cir. 2015), *as amended* (Mar. 24, 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he pleading standard Rule 8 announces does

not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007)).

[90] ECF Doc. No. 83 at ¶ 27.

[91] *Id.* at ¶ 33.

[92] *Id.* at ¶ 36.

[93] *Id.* at ¶ 38.

[94] *Id.* at ¶ 40.

[95] *Id.* at ¶ 44.

[96] *Id.* at ¶ 46.

[97] ECF Doc. No. 85.

[98] ECF Doc. No. 87.

[99] ECF Doc. No. 86 at 4-10.

[100] *Id.*

[101] *Id.*

[102] ECF Doc. No. 84 at ¶ 1.

[103] ECF Doc. No. 93 (noting USM-285 forms were sent to Mr. Carroll on May 31, 2019, June 20, 2019, and July 25, 2019).

[104] ECF Doc. No. 94.

[105] ECF Doc. No. 95 at ¶ 13.

[106] *Id.*

[107] When considering a motion to dismiss "[w]e accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[108] *See* Fed. R. Civ. P. 8(a)(2). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is *678 entitled to relief." As the Court held in *Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. Id., at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S.Ct. 1955." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

[109] ECF Doc. No. 86 at 4-10.

[110] *Id.* at 4 (citing *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).

[111] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir.2010) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.") (citation omitted).

[112] 1 Pa. Cons. Stat. Ann. § 2310. Pa. Const. art. 1 §11.

[113] *E.g.*, ECF Doc. No. 83 at ¶¶ 20, 22, 42-43.

[114] *Id.* at ¶¶ 6, 9; ECF Doc. No. 103.

[115] ECF Doc. No. 83 at ¶¶ 9, 16.

[116] *Id.* at ¶¶ 17, 20, 23.

[117] *Id.* at ¶¶ 20, 21, 49.

[118] *See* 42 Pa. Cons. Stat. Ann. § 8522(b).

[119] 1 Pa. Cons. Stat. Ann. § 2310; *see also Basile v. Twp. of Smith*, 752 F. Supp. 2d 643, 670 (W.D. Pa. 2010) ("since the state common law claims against Officers Price and North, in their official capacities, if successful, would impose liability on their respective municipalities, and under §§ 8541 and 8542(b), municipalities are immune from suit, even for acts of malice or willful misconduct, the municipalities' immunity likewise applies to Defendants' Price and North in their official capacities. Accordingly, the state common law claims of false arrest and malicious prosecution against Officers Price and North, in their official capacities, will be dismissed with prejudice.").

[120] ECF Doc. No. 83 at ¶ 7.

[121] *Id.* at ¶¶ 10, 11, 39.

[122] ECF Doc. No. 85 at 13-14.

[123] In our June 6 Memorandum dismissing Mr. Carroll's breach of contract action against the University, we explained:

> A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." The Pennsylvania Supreme Court "has declined to construe the student handbook of a public university as a contract between the public university and the student." In *Johnson v. Temple Univ.*, the district court granted the defendant's motion for summary judgment. Regarding a breach of contract claim, the district court held the plaintiff's reference to the university's handbook as a contract is unfounded.

ECF Doc. No. 86.

Because Mr. Carroll claimed the University was liable for breach of contract by failing to follow the Program's Student Handbook, and this Handbook failed to meet basic requirements of being a contract, we dismissed Mr. Carroll's breach of contract action against the University.

Mr. Carroll also bases his breach of contract action against Professor Hoover on the Professor's alleged breach of the Student Handbook. As we found five months ago, an alleged violation of the Handbook cannot support a breach of contract claim. Mr. Carroll's breach of contract claim against Professor Hoover fails and is dismissed.

[124] ECF Doc. No. 83 at ¶ 47.

[125] 42 U.S.C. § 2000a(a). Congress provided: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." *Id.*

[126] *U.S. v. Lansdowne Swim Club*, 894 F.2d 83, 86 (3d Cir. 1990).

[127] 42 U.S.C. § 2000a(b).

[128] *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969).

[129] In our June 6, 2019 Memorandum, we explained:

> In *Gilmore v. Amityville Union Free Sch. Dist.*, the district court dismissed the Title II claim as the plaintiffs did not offer "evidence to the contrary" showing the defendant was a place of public accommodation. 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004). School board candidates claimed the defendant incorrectly counted election votes. *Id.* at 274. The election took place at two public schools within the district. *Id.* The district court found "that '[p]ublic schools do not purport to be open to the general public in the ways, that for example, hotels, restaurants and movie theaters (all establishments explicitly covered by Title II) do.'" *Id.* at 278-79 (citing *Harless v. Darr*, 937 F. Supp. 1351, 1354 (S.D. Ind. 1996)).
>
> In *Martin v. Univ. of New Haven, Inc.*, the plaintiff alleged private university faculty harassed him and discriminated against him due to his religion. 359 F. Supp. 2d 185, 188 (D. Conn. 2005). The plaintiff claimed the private university is liable under the Civil Rights Act because there is a cafeteria on the premises, which satisfies the place of public accommodation. *Id.* The district court granted the defendant's motion for summary judgment because the plaintiff did not demonstrate the university's cafeteria serves the general public rather than only faculty, staff, and students. *Id.* at 188-89.
>
> We are also persuaded by the court's reasoning in *Alja-Iz v. Ramsey*, where the plaintiff sued a public university for denying him "admission to certain higher-level math classes and to the [university's] PhD program." No. 14-618, 2017 WL 6485803, at *12 (W.D. Ky. Sept. 13, 2017), *report and recommendation adopted* 2017 WL 6504012 (W.D. Ky. Sept. 22, 2017). The district court found, "[t]he University's graduate mathematics department is not a place of public accommodation as contemplated by Title II of the Civil Rights Act. Rather, it is a source of academic programs intended to have competitive admission policies and specialized areas of academic interest." *Id.* The district court also held "the concept of a place of public accommodation does not apply to the University as a whole or all of the actions of its agents." *Id.*

ECF Doc. No. 86 pp. 7-8.

[130] ECF Doc. No. 83 at ¶ 46.

[131] *Davis v. City of Dearborn*, No. 09-14892, 2010 WL 5282015, at *18-19 (E.D. Mich. Dec. 17, 2010) (internal citations removed) (dismissing plaintiff's Title III claim).

[132] ECF Doc. No. 83 at ¶ 46.

[133] *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004) (explaining Title IV "was enacted to remedy the problem of segregation in public schools and colleges").

[134] *Davis v. Hooper*, No. 07-632, 2008 WL 4220062 (D. Del. Sept. 15, 2008).

[135] *Id.* at *1.

[136] *Id.* at *14; *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 724 n.12 (White, J., dissenting).

[137] 42 U.S.C. § 2000c-8; *see also Bedford v. Univ. of Louisville Sch. of Med.*, No. 88-6423, 1989 WL 123143, at *3 (6th Cir. Oct. 19, 1989) (finding "[t]he District Court properly found that § 2000c–8 does not create a separate cause of action, but rather preserves private rights of action under other civil rights acts").

[138] Moving defendants raised this claim in their initial responsive pleadings as required under Fed. R. Civ. P. 8(c)(1). ECF Doc. No. 18; ECF Doc. No. 99; ECF Doc. No. 103; ECF Doc. No. 107; ECF Doc. No. 108.

[139] 42 Pa. Cons. Stat. ¶ 5524.

[140] *Stephens v. Clash*, 796 F.3d 281, 287-288 (3d Cir. 2015).

[141] *Kach v. Hose*, 589 F.3d 626, 639 (3d Cir. 2009).

[142] 42 Pa. Cons. Stat. ¶ 5533.

[143] *Wisniewski v. Fisher*, 857 F.3d 152, 157-158 (3d Cir. 2017).

[144] *Glover v. FDIC*, 698 F.3d 139, 145 (3d Cir. 2012).

[145] *Id.* (quoting *Nelson v. County of Allegheny*, 60 F.3d 1010, 1014-15 (3d Cir. 1995)).

[146] ECF Doc. No. 3.

[147] ECF Doc. No. 17.

[148] ECF Doc. No. 82.

[149] ECF Doc. No. 83.

[150] Mr. Carroll did not timely plead false arrest or false imprisonment claims against either Sergeant Flood or Officer Stuchkus in his first amended complaint. He does not state a claim for

false arrest. He pleads Sergeant Flood arrived at the Registrar Office on March 25, 2015 but does not plead Sergeant Flood falsely arrested him. Mr. Carroll does not plead facts against Officer Stuchkus in his first amended complaint. Mr. Carroll's false arrest and false imprisonment claims only survive the statute of limitations if they relate back to the original complaint; we conclude they do not.

[151] 3 Moore's Federal Practice, ¶ 15.19[3][a] (3d ed. 2019).

[152] Fed. R. Civ. P. 15(c)(1)(c).

[153] ECF Doc. No. 3 at 3.

[154] *Id.* at 2.

[155] F. R. Civ. P. 15(c)(1)(B) (amended pleading relates back when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—*or attempted to be set out*—in the original pleading" [emphasis added]); 3 Moore's Federal Practice, ¶ 15.19[2] (3d ed. 2019).

[156] *Glover v. FDIC*, 698 F.3d 139, 145-146 (3d Cir. 2012).

[157] Mr. Carroll filed his second amended complaint name Officer Stuchkus and Sergeant Flood in May 2019. Even if Mr. Carroll accomplished timely service of moving defendants, he would not have provided formal notice within ninety days of filing of the original complaint, or by June 2016.

[158] *Garvin v. City of Philadelphia*, 354 F.3d 215, 222-223 (3d Cir. 2003) (quoting *Singletary v. Pennsylvania Department of Corrections*, 266 F.3d 186, 197 (3d Cir. 2001)).

[159] *Id.* at 223 ("Inasmuch as Neuhauser's representation did not begin until after the 120-day period following the filing of the complaint had ended, any later shared representation was irrelevant in the relation back analysis.").

[160] *Singletary v. Pennsylvania Department of Corrections*, 266 F.3d 186, 200 (3d Cir. 2001).

[161] *Id.* at 199.

[162] *Id.*

[163] ECF Doc. No. 10.

[164] F. R. Civ. P. 15(c)(1)(C)(ii).

[165] 3 Moore's Federal Practice, ¶ 15.19[3][d] (3d ed. 2019).

[166] *Id.*

[167] *Arther v. Maersk, Inc.*, 434 F.3d 196, 208 (3d Cir. 2006).

[168] *Fields v. Blake*, 349 F. Supp. 2d 910, 918 (E.D.Pa. 2004).

[169] 3 Moore's Federal Practice, ¶ 15.19[3][d] (3d ed. 2019); *See, e.g., Stewart v. Philadelphia Housing Authority*, 487 F. Supp. 2d 584, 590 (E.D.Pa. 2007).

[170] *Krupski v. Costa Crociere SpA*, 560 U.S. 538, 553-554 (2010).

[171] ECF Doc. No. 17 at 3 ("Mr. Carroll has liberty and property interest [sic] in his continued education in Millersville University of Pennsylvania Respiratory Program. He notice [sic] he lost this property right when he was retaliated against for asking for his Student Record on March 27, 2015 he was suspended [sic]"); *Id.* at 4 ("Plaintiff was expelled without a hearing for asking for his Student Records On [sic] March 27, 2015"); *Id.* at 12 ("The plaintiff [sic] rights to property and liberty was [sic] violated by defendant (Millersville University of Pennsylvania) [sic] on March 27, 2015. The University suspended the plaintiff indefinitely without a hearing in retaliation for i [sic] requesting copies of his student record").

[172] ECF Doc. No. 17.

[173] Fed. R. Civ. P. Rule 15(c)(1)(B).

[174] *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004).

[175] *Id.*

[176] *Id.*

[177] ECF Doc. No. 17 at 3, 4, 12.

[178] ECF Doc. No. 83 at ¶¶ 29, 30.

[179] *Id.* at ¶ 31.

[180] *Id.* at ¶ 35.

[181] *Id.* at ¶ 32.

[182] *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

[183] *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L. Ed. 2d 548 (1972) ("Property interests are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.")).

[184] *Borrell v. Bloomsburg University*, 955 F. Supp. 2d 390, 402 (M.D. Pa. 2013).

[185] *Goss v. Lopez*, 419 U.S. 565, 574 (1975).

[186] *Id.*

[187] *Id.* at 581.

[188] *Id.* at 582.

[189] *Id.* at 582-583.

[190] *Id.* at 584.

[191] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

[192] ECF Doc. No. 83 at ¶ 29.

[193] *Id.* at ¶ 30; ECF Doc. No. 17-3 at 24.

[194] ECF Doc. No. 83 at ¶ 17.

[195] *Id.* at ¶ 29.

[196] ECF Doc. No. 17-3 at 24.

[197] ECF Doc. No. 83 at ¶ 17.

[198] *Id.* at ¶ 32.

[199] *Id.* at ¶ 23.

[200] *Id.* at ¶ 35.

[201] *Id.* at ¶¶ 31, 35; ECF Doc. No. 17-3 at 19, 22.

[202] ECF Doc. No. 99 at 17.

[203] Though Defendants argue the jury convicted Mr. Carroll of trespass on March 26 and March 31, the jury only convicted Mr. Carroll of defiant trespass from his appearance on campus on March 31, 2015. *Commonwealth of Pennsylvania v. Carroll*, 88 MDA 2016, CP-36-CR-0001537-2015 (Pa. Super. 2016). The jury acquitted Mr. Carroll of simple trespass with intent to terrorize from events on March 26, 2015. *Id.*

[204] ECF Doc. No. 17-3 at 22.

[205] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

[206] *Id.*

[207] *Id.*

[208] *Commonwealth of Pennsylvania v. Carroll*, 88 MDA 2016, CP-36-CR-0001537-2015 (Pa. Super. 2016).

[209] ECF Doc. No. 83 at ¶ 25.

[210] *Id.* at ¶ 25.

[211] ECF Doc. No. 17-3 at 15-16.

[212] *Id.* at 17-23.

[213] ECF Doc. No. 83 at ¶ 31.

[214] *Id.* at ¶ 35.

[215] ECF Doc. No. 17-3 at 15-16.

[216] ECF Doc. No. 83 at ¶ 34.

[217] ECF Doc. No. 17-3 at 17-23.

[218] *Id.* at 18.

[219] *Borrell v. Bloomsburg University*, 870 F.3d 154, 162 (3d Cir. 2017)

[220] *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[221] *Borrell*, 870 F.3d at 162 (citing *Pearson v. Callahan*, 555 U.S. 223, 244 (2009)).

[222] *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see Borrell*, 870 F.3d at 163 (identifying the relevant question for qualified immunity analysis as "[W]ould a reasonable official have known that her actions violated a clearly established right?").

[223] *Borrell*, 870 F.3d at 162 (quoting *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016)).

[224] *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

[225] *Id.*

[226] ECF Doc. No. 99 at 14.

[227] *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994).

[228] *Id.*

[229] *Id.* at 487 (emphasis in original).

[230] *Id.* (emphasis in original).

[231] *Id.* at 484-485.

[232] *Id.* at 486 n. 6.

[233] *Id.*

[234] *Nelson v. Jashurek*, 109 F.3d 142, 147 (3d Cir. 1997).

[235] *Id.* at 145.

[236] *Id.* at 145-146.

[237] *Id.*

[238] *Id.*

[239] *Commonwealth of Pennsylvania v. Carroll*, 88 MDA 2016, CP-36-CR-0001537-2015 (Pa. Super. 2016).

[240] 18 Pa.C.S. § 3503(b)(1)(i).

[241] ECF Doc. No. 83 at ¶ 23.